UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTHA MARIA AMARANTE, | 16-CV-00717 (RJS) (BCM) |
| Plaintiff, | |
| -against- | **REPORT AND RECOMMENDATION** |
| COMMISSIONER OF SOCIAL SECURITY, | **TO THE HON. RICHARD J. SULLIVAN** |
| Defendant. | |

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Martha Maria Amarante brings this action *pro se*, pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI). For the reasons set forth below, I respectfully recommend that the Commissioner's motion be DENIED.

## I.      BACKGROUND

### A.      Procedural Background

Amarante first filed an application for SSI on March 31, 2011, alleging disability since June 1, 2004 due to depression, somatic complaints, uncontrolled hypertension, and pain in the back, head, and breast. *See* Cert. Tr. of Record of Proceedings (Dkt. Nos. 10 through 10-10), at 59 (hereinafter R._). Her application was denied on May 1, 2012, following a hearing before Administrative Law Judge (ALJ) Wallace Tannenbaum. (R. 53-73.)

On January 17, 2013, Amarante again applied for SSI, alleging disability since January 1, 2004 due to schizoaffective disorder, high blood pressure, depression, hypertension, coronary artery disease, and pain in the back, head, and breast. (R. 17, 88, 196.) Her application was initially denied on March 28, 2013. (R.17.) On April 19, 2013, plaintiff timely filed a written request for a hearing, which took place before ALJ Lucian A. Vecchio on June 18, 2014. (R. 17, 34-52.) Plaintiff

appeared and testified through an interpreter. (R. 17, 36, 39-42.) She was represented by Arthur Thom, a non-attorney representative. (R. 17, 36.) Dr. Leslie Fine, a board-certified psychiatrist, and Christina Boardman, a vocational expert, also appeared and testified. (R. 17, 36, 47-51.) On July 31, 2014, the ALJ issued a decision finding that Amarante was not disabled within the meaning of the Act. (R. 17-29.) That decision became final on December 9, 2015, when the Appeals Council denied Amarante's request for review. (R. 1-3.)

On January 29, 2016, Amarante filed this action seeking judicial review of the ALJ's denial of her application. (Dkt. No. 2.) On August 26, 2016, the Commissioner moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings. (Dkt. No. 12.) Amarante did not respond within the 30 days granted by the Honorable Richard J. Sullivan, United States District Judge (Dkt. No. 5), nor within the extended time granted *sua sponte* by the undersigned Magistrate Judge. (Dkt. No. 14.) The Commissioner's motion is therefore unopposed.[1]

### B. Personal Background

Amarante was born on November 1, 1965, in the Dominican Republic. (R. 77, 333.) She completed 12 years of school in the Dominican Republic, but did not graduate high school. (R. 39, 59.) She does not speak English. (R. 39, 572.)

At the time of the hearing, plaintiff had lived in the United States for 23 years. (R. 38, 439.) She was lawfully admitted for permanent residence in either 1991 or 1995. (R. 413, 439.) She has reported working on and off in a factory from 1996 to 1998 (R. 400-01), but has also

---

[1] Even when a motion for judgment on the pleadings is unopposed, the court must review the entire record to determine whether it is appropriate to grant the motion. *See Gomez v. Commissioner of Social Security*, 2017 WL 2124470, at *8 (S.D.N.Y April 20, 2017); *Wellington v. Astrue*, 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013); *Martell v. Astrue*, 2010 WL 4159383, at *2 n. 4 (S.D.N.Y. Oct. 20, 2010).

identified January 1, 2004, as the date she stopped working. (R. 400.) Her jobs included putting tags and labels on clothing (R. 401) and packing CDs. (R. 389.)

Amarante was married in New York in 1991. (R. 407.) The following year, she gave birth to her first son, who has autism and mental retardation. (R. 378, 414.) Six years later, she gave birth to a second son, who has a learning disability and chronic skin allergy. (R. 378.) Amarante has lived apart from her husband since January 1, 2004 (R. 411), which is the same date she alleges she stopped working and the same date she alleges she became disabled. (R. 400, 412.)

At the time of her hearing, Amarante had not worked for 15 years. (R. 48.) She testified that she spends the day doing housework with the help of a home attendant, who is there to help her son. (R. 41, 44.) Amarante's housework includes readying her second son for school, cooking, and grocery shopping. (R. 581.) The extent to which plaintiff is able to independently take care of her personal needs, including grooming, bathing, dressing, and cooking for herself, is unclear. At times, the record indicates few or no limitations in her activities of daily living (R. 206, 345-46, 581), while in other instances, Amarante states that she is unable to dress appropriately (R. 205), has difficulty caring for her hair (R. 222), sometimes does not shower because she feels depressed (205, 222), and generally needs help with such activities. (R. 253.) Similarly, the record is inconsistent with respect to whether plaintiff is able to take public transportation without assistance and manage money for her household. (*Compare*, *e.g.*, R. 207 *with* R. 581.) She goes to church, visits her sister at her home, and goes to the park when her "conditions permit." (R. 226.)

## II.      PRE-HEARING EVIDENCE

The period at issue is January 17, 2013, the date Amarante filed her application for SSI (R. 165), through July 31, 2014, the date of the ALJ's decision. (R. 11.)

## A.  Pre-Application Evidence

Amarante saw Dr. Gerardo Tapia in connection with her psychiatric symptoms beginning in 2009 (R. 199) or 2010 (R. 65). Dr. Tapia apparently submitted a medical report when Amarante first applied for SSI (*see* R. 75), but that report does not appear in the current record.  Rather, the record contains four sets of progress notes from Amarante's appointments with Dr. Tapia on August 13, October 3, and December 6, 2012, and January 30, 2013. (R. 575-78.) During her visit on December 6, 2012 – approximately a month before she filed her application for SSI – Amarante reported to Dr. Tapia that she "fe[lt] so so" and was "afraid of losing the control [sic] when argue with friends [sic]." (R. 577.) However, she "denie[d] recent stressors" and reported having no suicidal or homicidal ideas, "no agitation," "no gross delusions," and "state[d] her mind is better." *Id.* Dr. Tapia assessed major depressive disorder, recurrent episodes, moderate, and prescribed Haldol and Benadryl. *Id.* [2]

From December 2012 through January 2013, Amarante was evaluated by a social worker and a physician at the Institute for Family Health through Federation Employment & Guidance Service (F.E.G.S.).[3] The results of this evaluation are contained in an F.E.G.S. Biopsychosocial Report (BPS Report) (R. 620-67), which states that Amarante told Elizabeth Vargas, a F.E.G.S. social worker, that she has travel limitations and experienced stress due to "her older son who is

---

[2] Haldol is a brand name for haloperidol, which is "used to treat psychotic disorders . . . [and] to treat severe behavioral problems such as explosive, aggressive behavior." *Haloperidol*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682180.html.  Benedryl is a brand name for diphenhydramine, an over-the-counter antihistamine. *Diphenhydramine*, Medline Plus, https://medlineplus.gov/druginfo/meds/a682539.html.

[3] F.E.G.S. was a New York City program that provided "assistance [for] applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits." *Morales v. Colvin*, 2015 WL 2137776, at *7 n.16 (S.D.N.Y. May 4, 2015). F.E.G.S. assisted Amarante with her SSI application forms. (R. 196, 396, 426.)

diagnosed with [a]utism and has mental health issues." (R. 630.) Vargas noted that Amarante "is not interested in applying for SSI [and] is not interested in working [because] she reported that she cares for her mentally ill son." (R. 632.)

On December 28, 2012, Amarante was evaluated by Dr. Rose Chan, a physician at F.E.G.S. (R. 351-62.) Dr. Chan noted that Amarante "appears anxious . . . [and] seems overwhelmed." (R. 360.) She also noted that Amarante had panic symptoms, at times with palpitation, and needed a travel companion. (R. 355.) Amarante had previously complained to social workers at F.E.G.S. that she had been hearing "voices" since approximately 2008 (*see* R. 316, 388), but that the "voices improved on [H]aldol." (R. 355.) Amarante reported no suicidal ideations. *Id.* Her history of lumbago had improved. *Id.*[4] Dr. Chan found that Amarante had depression, anxiety, and lower back pain, and could only bend for one to three hours and lift a maximum of 20 pounds for up to ten times an hour. (R. 356.) Dr. Chan recommended that Amarante "avoid high stress." (R. 357.)

On December 31, 2012, Amarante was examined by Dr. Anthony Dark, also a physician at F.E.G.S. (R. 388-91.) Dr. Dark noted that during his interview of Amarante, she "appear[ed] somewhat disorganized in her thinking and [was] tangential in her responses at times." (R. 389.) Amarante denied having suicidal and homicidal ideation. *Id.* In his "Final Diagnoses Comments," Dr. Dark stated that Amarante "has a chronic mental illness (schizo-affective disorder) and is receiving psychiatric treatment with psychotropic medications under the care of a psychiatrist." (R. 390.) He also stated that Amarante's "activities of daily living are restricted and prevent adherence to regular work routine which prevents employment." *Id.*

---

[4] Lumbago generally refers to low back pain. Ari Ben-Yishay, M.D., *Understanding Low Back Pain (Lumbago)*, Spine-health, https://www.spine-health.com/conditions/lower-back-pain/understanding-low-back-pain-lumbago.

On January 30, 2013, Amarante saw Dr. Tapia again. She reported "[f]eel[ing] so so" and wanted to "ge[t] back to [R]isperidone as [H]aldol makes her feel[] restless." (R. 578.) She "denie[d] recent stressors" and reported having "no gross thought disorder," feeling "calmer [and having] better insight," and said that "her son is doing well with meds." *Id.* Dr. Tapia assessed major depressive disorder, recurrent episodes, severe, and specified psychotic behavior. *Id.* Dr. Tapia stopped prescribing Haldol and Benadryl and instead prescribed Risperidone. *Id.*[5]

## B.    Post-Application Evidence

On March 7, 2013, Amarante visited Dr. Michael Kushner for a consultative psychiatric examination. (R. 579-83.) Dr. Kushner noted that Amarante's "[d]emeanor and responsiveness to questions [were] generally cooperative," and her "[m]anner of relating, social skills, and overall presentation [were] adequate." (R. 580.) Her posture and motor behavior were normal and her eye contact was appropriate. *Id.* Her thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." *Id.* Her affect was of full range and she was "appropriate in speech and thought content." *Id.* Amarante's mood was neutral and her sensorium and orientation were clear. *Id.* Although Dr. Kushner noted that Amarante's judgment was good and her insight was fair, he found that her attention and concentration were impaired and "she could not count backwards from 20 by 3s." (R. 581.) Dr. Kushner also noted that Amarante's recent and remote memory skills were impaired, her intellectual functioning seemed to be "somewhat below average," and her "[g]eneral fund of information seem[ed] somewhat limited." *Id.* Amarante told Dr. Kushner that her daily activities included dressing, bathing, and grooming herself, as well as handling household chores, with

---

[5] Risperidone is "used to treat symptoms of schizophrenia . . . in adults . . . [and] is also used to treat episodes of mania . . . or mixed episodes (symptoms of mania and depression that happen together) in adults." *Risperidone*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694015.html.

which she received assistance from her son's home health aide. *Id.* Plaintiff also told Dr. Kushner that she socialized with others and had a good family relationship. *Id.* Based on his examination, Dr. Kushner reported that Amarante "can follow and understand simple directions and instructions" and can "perform simple tasks independently." *Id.* Dr. Kushner noted that Amarante's ability to maintain attention and concentration may be impaired, though she "can maintain a regular schedule," "learn new tasks," and "may be able to perform complex tasks under supervision" and "generally make appropriate decisions." *Id.* Dr. Kushner also reported that plaintiff's "ability to relate adequately with others and appropriately deal with stress may be impaired by psychiatric problems." *Id.* Nevertheless, Dr. Kushner reported that Amarante's psychiatric problems did not "appear to be significant enough to interfere with [her] ability to function on a daily basis." (R. 582.) Dr. Kushner diagnosed Amarante with depressive and psychotic disorders, not otherwise specified, and recommended that she continue with her psychiatric treatment and consider a neurological evaluation for her memory problems. *Id.*

On March 7, 2013, Amarante visited Dr. Vinod Thukral for a consultative internal medicine examination. (R. 584-87.) Amarante told Dr. Thukral that her daily activities included "cooking, cleaning, laundry, and shopping." (R. 585.) She also told Dr. Thukral that she "showers and dresses daily . . . goes to church and socializes with friends." *Id.* During the examination, Amarante was "alert, awake, and oriented" and "appeared to be in no acute distress." (R. 584, 585.) She had a normal gait and stance, could walk on her heels and toes without difficulty, fully squat, could rise from a chair with no difficulty, used no assistive devices, and did not need help changing for the exam or getting on and off the exam table. (R. 585.) Her heart examination showed a regular rhythm with no audible murmur, gallop, or rub, although there was a perioperative myocardial injury in the left fifth intercostal space at the midclavicular line. (R. 586.)

Her musculoskeletal examination was normal, with full ranges of motion throughout the spine in all directions, and no scoliosis, kyphosis, or abnormality in the thoracic spine. *Id.* Dr. Thukral's diagnoses included hypertension, lower backache, anxiety disorder, depression, insomnia, and memory loss. (R. 586-87.) Dr. Thukral concluded that based on his examination of Amarante, she "has no limitations for sitting, standing, bending, pulling, pushing, lifting, carrying, or any other such related activities." (R. 587.)

On March 27, 2013, Dr. Edward Kamin, a state agency psychologist, assessed Amarante's mental impairments based on the available medical record. (R. 81-86.) Dr. Kamin found that Amarante had limitations with respect to understanding and memory, sustained concentration and persistence, and social interactions. (R. 82-83.)

On April 17, 2014, Amarante saw Dr. Aurelio Salon for a supplemental consultative internal medicine examination. (R. 589-93.) Dr. Salon's examination findings were largely similar to those of Dr. Thukral, although Dr. Salon also noted that plaintiff is obese. (R. 590.) The results of the mental status screening were unremarkable. (R. 592.) Dr. Salon noted that "there are no objective findings to support the fact that the claimant would be restricted in her ability to sit or stand, or in her capacity to climb, push, pull, or carry heavy objects." *Id.* In a report dated April 22, 2014, Dr. Salon noted that Amarante could lift and carry up to 100 pounds occasionally, and her lower back, knee, and hand were stable. (R. 594.) Dr. Salon further found that Amarante could travel without a companion, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for her hygiene, and sort, handle, or use papers and files. (R. 599.)

On April 17, 2014, Amarante saw Dr. Haruyo Fujiwaki for a supplemental consultative psychiatric examination. (R. 602-08.) Dr. Fujiwaki's examination findings were largely similar to

those of Dr. Kushner. Dr. Fujiwaki noted that Amarante's attention and concentration and recent and remote memory skills were mildly impaired, that she "is moderately impaired in learning new tasks and performing complex tasks independently," that she could "make appropriate decisions," and that she "is moderately impaired in relating adequately with others and appropriately dealing with stress." (R. 603-04.) Dr. Fujiwaki diagnosed Amarante with unspecified depressive disorder and unspecified anxiety disorder, and noted "[r]ule out unspecified schizophrenia spectrum and other psychotic disorder." (R. 604.) Dr. Fujiwaki recommended that plaintiff "continue with psychological and psychiatric treatment as currently provided." *Id.* Finally, Dr. Fujiwaki found that Amarante's impairments did not impact her ability to understand, remember, and carry out simple instructions, or to interact appropriately with the public. (R. 606-07.)

## III. HEARING

On June 18, 2014, Amarante appeared at a hearing before ALJ Vecchio. She testified, through an interpreter, that she was 48 years old and had been in the United States for 23 years but did not speak English. (R. 38-39.) She had completed 12 years of schooling, but was unable to graduate due to "problems." *Id.* Amarante testified that she was not working because of her children and her schizophrenia. *Id.* When the ALJ asked plaintiff who told her that she had schizophrenia, Amarante replied, "I explained to the doctor if I have a problem with somebody, and they try to tell me something, everything goes blank in my mind. And I become violent. If people try to invade me, I lose control." (R. 39-40.) She testified that the last time she was violent with someone was two months prior. (R. 40.) She had been telling her super to fix something for two weeks and he had not fixed it, so she got furious. *Id.* When the ALJ asked Amarante what happened, she replied, "I took my glasses off. I scraped them on the floor, then I -- I pull up my

skirt and started insulting him. I lost control." *Id.* When the ALJ asked Amarante whether she hit the super, Amarante testified that she did not. *Id.*

Amarante testified that she saw her doctor about her emotional problems every two months. (R. 41.) When the ALJ asked plaintiff if anything else bothered her, she stated, "I see things. I hear voices." *Id.* When the ALJ asked Amarante what things she saw, she stated, "Like I see things on the T.V., the violent stuff, then I repeat it in my mind. And if I watch the soap, the [tele]novela, then I repeat the thoughts in my mind." *Id.*

When the ALJ asked Amarante how she spends her day, Amarante responded, "I do my housework with the help of my home attendant, because I have to rest a lot, because I have pain in my neck, in my brains. I get depressed. My back hurts. There are days in which I am a little better. But there's a lot of time that I'm just suffering from my illness. I try to control my illness, to be able to raise my children." (R. 41-42.)

Dr. Fine then questioned Amarante. (R. 44.) Plaintiff testified that the home attendant was there to take care of her son, but she also helped Amarante. *Id.* Plaintiff also testified that she received medication from Dr. Tapia for her mental impairments. *Id.* Dr. Fine informed the ALJ, inaccurately, that Dr. Tapia was a primary care physician, not a psychiatrist. The relevant portion of the hearing transcript reads as follows:

Q      . . . Are you getting medicine from Dr. Tapia?

A      For the mental problems.

Q      Yeah.

A      For the anxiety.

Q      Yeah.  What kind of doctor is Dr. Tapia?

A      He's a very good doctor, because he always wants to know how I'm feeling.

> Q        Is he a primary care doctor or a psychiatrist?
>
> A        He's my psychiatrist.
>
> ME      He's not a psychiatrist, Your Honor.
>
> CLMT (Untranslated response.)

(R. 44.)

The ALJ asked Dr. Fine to comment on the nature and severity of Amarante's medical impairments. (R. 45.) He testified that although Dr. Tapia diagnosed her with major depressive disorders, Dr. Kushner, the psychiatric consultative examiner, indicated that Amarante's psychological problems "do not significantly interfere with daily functioning." *Id.* Dr. Fine also stated that Dr. Fujiwaki's findings indicated that Amarante had below-average cognition, but that she socializes, and that her activities of daily living were unlimited. (R.45.) Further, Dr. Fujiwaki found that she had only "mild impairment" maintaining attention and concentration and "[m]oderate impairment doing new tasks, relating to others and dealing with stress." (R. 45-46.) Dr. Fine opined that Amarante did not have a listed impairment because she had no impairment with respect to her activities of daily living, and only moderate impairment in socialization, concentration, persistence and pace. (R. 46.)

The ALJ next questioned Boardman, who testified that she could not identify in the record any work that Amarante performed in the last 15 years. (R. 48.) The ALJ then provided the following hypothetical to Boardman:

> Assume I find this claimant capable of medium levels of exertion. Assume I find no additional exertional limitations. Now, assume I find the following non-exertional limitations. That she would have no interaction with the public, occasional with coworkers. And this is due to her being considered, for the moment, as having moderate social limitations. Now, assume also that I restrict her to no more than work that involves no more than two-step tasks. Of course, they can be more than two tasks, but each task would not have more than two steps and of a repetitive nature. And, again, this would be due to limitations in

pace. Now, assume she would also be given no high-production or quota work, as that term is understood in your expertise . . . . due to pace limitations . . . finally, let's assume that she might be off task, but not more than five percent of the day . . . . due to pace [limitations].

(R. 49.) Boardman provided "two illus[trat]ive examples" of jobs that someone with that profile could perform: a ticketer and a garment sorter. (R. 49-50.) The hearing was then adjourned. (R. 52.)

## IV. ALJ DECISION

### A. Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. § 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 18-20.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local

economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.912(f), 416.960(c).

The regulations as they existed at the time of the Commissioner's decision provide further guidance for evaluating whether a mental impairment meets or equals a listed impairment under the third step. In a "complex and highly individualized process," 20 C.F.R. § 416.920a(c)(1), the ALJ must determine how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The main areas that are assessed are the claimant's (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3)(2011).[6] The first three categories are rated on a five-point scale from "none," through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4) (2011). A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(c). The last area – episodes of decompensation – is rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4).

---

[6] As of January 18, 2017, the text of 20 C.F.R. §§ 416.920a (c)(3) and (c)(4) has been amended to read, "(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself . . . (4) When we rate your degree of limitation in these areas . . ., we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." The Court applies the regulations as they existed at the time of the Commissioner's decision.

Furthermore, with respect to the listed mental disorders, including affective disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B).[7] The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C).

If the mental disorder does not qualify as a listed impairment under the regulations, it may still qualify as a disability if the claimant's RFC does not allow her to perform the requirements of her past relevant work, or if the claimant's limitations, age, education, and work experience dictates that she cannot be expected to do any other work in the national economy. 20 C.F.R. § 416.920(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 416.920(e), 416.945(a)(3).

---

[7] As of January 18, 2017, the text of 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 12.00 and 12.04 has also been amended. The Court applies the regulations as they existed at the time of the Commissioner's decision.

Finally, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do, given her RFC. 20 C.F.R. § 416.960(c)(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Pt. 404, subpt. P, app'x 2, typically guide this evaluation, placing claimants with exertional limitations into categories according to their RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(f). However, "[u]nder the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

**B.     Application of Standards**

ALJ Vecchio found that Amarante "has not been under a disability within the meaning of the Social Security Act since January 17, 2013," the date her application was filed. (R. 18.) In making his determination, the ALJ "considered the complete medical history." *Id.*

At step one, the ALJ found that Amarante had not engaged in substantial gainful activity since January 17, 2013. (R. 21.)

At step two, the ALJ found that Amarante suffered from the following "severe" impairments: (i) schizophrenia, (ii) depressive disorder, (iii) hypertension, and (iv) a history of lumbago. *Id.*

At step three, the ALJ found that none of Amarante's impairments meet or medically equal the severity of one of the listed impairments. *Id.* The ALJ considered listing 1.04 (disorders of the back), finding that the medical evidence did not establish the requisite evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, and, that there was no evidence that

Amarante's back disorder resulted in her inability to ambulate effectively, such that paragraph C

was not satisfied. *Id.* The ALJ also considered listing 4.03 (hypertensive cardiovascular disease)

and concluded that it was not met because there was no evidence of cardiac enlargement,

congestive heart failure, or of vision, kidney, or neurological impairment. *Id.*[8] The ALJ also found

that Amarante's mental impairments failed to satisfy the criteria of listings 12.03 and 12.04,

particularly the requirements of paragraphs B and C. (R. 21, 22.) In reaching this conclusion, the

ALJ found that Amarante had no restrictions with respect to her activities of daily living, based

primarily on her reports to the consultative examiners regarding her daily activities. (R. 21-22.)

He found that she had moderate difficulties in social functioning, based primarily on Amarante's

responses to the questions in the function report she submitted with her application. (R. 22.)

Further, the ALJ found that Amarante had only moderate difficulties with respect to concentration,

persistence, and pace, based primarily on the unremarkable mental status evaluations in the record.

*Id.* Finally, the ALJ found that there was no evidence of repeated episodes of decompensation of

extended duration or a residual disease process that would satisfy the paragraph C criteria. *Id.*

At step four, the ALJ concluded that Amarante has the RFC to perform medium work as

defined under 20 C.F.R. § 416.967(c), except that she cannot interact with the public and is limited

to occasional interaction with co-workers. (R. 23.) The ALJ also found that Amarante is restricted

to work that involves no more than two-step tasks of a repetitive nature, and cannot perform high

production or quota work. *Id.* In determining Amarante's RFC, the ALJ gave "great weight" to the

"former portion" of psychiatric consultative examiner Dr. Kushner's opinion, which concerned

Amarante's extensive activities of daily living. (R. 24.) However, the ALJ gave "less weight" to

---

[8] The ALJ fails to note that listing 4.03 is no longer in effect. *See* Revised Medical Criteria for
Evaluating Cardiovascular Impairments, 71 F.R. 2312-01 (2006); *Jones v. Colvin*, 2017 WL
1321015, at *16 & n.25 (S.D.N.Y. Mar. 31, 2017).

the "latter portion" of Dr. Kushner's opinion, pertaining to Amarante's social abilities and ability to maintain concentration, persistence, and pace, because the Dr. Kushner's language was "vague." *Id.* The ALJ also considered the opinion of internal medicine consultative examiner Dr. Thukral, finding that it was entitled to "great weight" because it was consistent with the "unremarkable preceding physical examination." (R. 24-25.) The ALJ then noted that, while the RFC he reached "takes into account the benign objective findings, it also generously considered the claimant's subjective complaints." (R. 25.) Next, the ALJ considered the opinion of consultative internal medicine examiner Dr. Salon, concluding that it was entitled to "great weight" because it was consistent with the "unremarkable preceding physical examination and with the opinions of the prior internal medicine consultative examiner." *Id.* Similarly, the ALJ found the opinion of psychiatric consultative examiner Dr. Fujiwaki was entitled to "great weight" because it was "consistent with the claimant's presentation on the preceding mental status examination where she did not exhibit significant cognitive, social or behavioral deficits and continued to report normal activities of daily living." *Id.*

It was at this stage that the ALJ addressed the treatment that Amarante received from Dr. Tapia. ALJ Vecchio stated:

> She has not generally received the type of medical treatment one would expect for a totally disabled individual. While the claimant reported that she has received psychiatric care on a monthly basis from Dr. Gerardo Tapia, the record reveals that this doctor is in fact a primary care physician, who beyond prescribing psychotropic medications has not provided specialized mental health treatment. Moreover, the record reveals that the claimant only visited with this physician on a total of four occasions from August of 2012 through January of 2013. In Dr. Tapia's last treatment note of record, the claimant denied any recent stressors and reported that her son was doing well. It was also reported that the claimant did not have a gross thought disorder and that she appeared calmer with better insight.

(R. 27.) (citations omitted).

At step five, the ALJ concluded that Amarante has the RFC to perform jobs that require "medium work," including jobs as a ticketer or garment sorter, on the basis of the vocational expert's testimony. (R. 28.)

### C.  Additional Evidence

Amarante attached to her complaint in the current action a letter from a psychiatrist, Dr. Giovanny Nuñez, dated January 22, 2016 (the Nuñez Letter), stating that he is treating her for Bipolar II Disorder and prescribing Zyprexa, Fluoxetine, and Buspar.  Dr. Nuñez states:

> Ms. Amarante is dealing with major stressors at this time including lack of energy, poor motivation, unable [sic] to concentrate or pay attention to things even when [it] is important for her life, inability to perform or to enjoy activities she used to do, insomnia, and social withdrawal. She follows treatment for her condition with psychotherapy and medication management and continues to need ongoing psychiatric treatment. Due to her illness and symptoms she is unable to work.

(Nuñez Letter.)

## V.  ANALYSIS

### A.  Legal Standard

Where, as here, the Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, she must establish that no material facts are in dispute and that she is entitled to judgment as a matter of law.  *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

### B.  Judicial Review

"Any individual, after any final decision of the Commissioner of Social Security . . . , may obtain a review of such decision by a civil action commenced . . . in the district court of the United States."  42 U.S.C. § 405(g).   The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court reviewing

the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hahn*, 2009 WL 1490775, at *6 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence"). Where the ALJ adequately explains his reasoning, however, and where his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not

substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review") (quoting *Beres v. Chater*, 1996 WL 1088924 at *5 (E.D.N.Y. May 22, 1996)); *Cleveland v. Apfel*, 99 F. Supp. 2d 374, 379 (S.D.N.Y. 2000) ("This Court may not substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review.").

This case turns on the application of two principles governing social security appeals: the treating physician rule and the ALJ's duty to develop the record.

### C.  The Treating Physician Rule

The treating physician rule requires the ALJ to give controlling weight to the opinion of a claimant's treating physician so long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). The rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the treating physician rule takes on added importance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). "A mental health patient may have good days and bad days; [he] may respond to different stressors that are

not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015). *See also Richardson v. Astrue*, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.") (internal citations and quotation marks omitted).

In this Circuit, the treating physician rule is robust, though not unassailable:

> Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012). *See also* 20 C.F.R. § 416.927(c)(2) (listing factors). Assuming a sufficiently lengthy doctor-patient relationship with adequate opportunities for examination, the ALJ can discount the treating physician's opinion only if the ALJ believes that it "lack[s] support or [is] internally inconsistent." *Duncan v. Astrue*, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). *Accord Lacava v. Astrue*, 2012 WL 6621731, at *12 (S.D.N.Y. Nov. 27, 2012).

"When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). If the ALJ does not afford controlling weight to the opinion of the treating physician, the ALJ must provide "good reasons" for that decision. *Halloran*, 362 F.3d at 32-33 (citing *Schaal*,

134 F.3d at 505) (internal quotation marks omitted). *See also* 20 C.F.R. § 416.927(c)(2) (the Commissioner "will always give good reasons in our . . . decision for the weight we give your treating source's opinion"). An ALJ who fails to explain why he discounted the treating physician's opinion deprives the court of the ability to determine accurately whether his conclusion is supported by substantial evidence; in these cases, remand is appropriate. *Snell*, 177 F.3d at 134; *Ferraris*, 728 F.2d at 587.

Here, ALJ Vecchio fails even to acknowledge Dr. Tapia as a treating physician, despite a long-standing doctor-patient relationship. Indeed, while he specifically identifies the weight that he accorded to the evidence presented by consulting physicians (R. 24-26), the ALJ never explicitly states the degree of significance that he attached to Dr. Tapia's notes. (R. 27.) And, although the ALJ does discuss what he finds to be inconsistencies between Dr. Tapia's observations and other evidence in the record, he either does not mention or misapplies other factors relevant to evaluation of a medical provider's evidence. For instance, although he states that Amarante "only visited with this physician on a total of four occasions from August of 2012 through January of 2013," *id.*, the ALJ does not acknowledge that Dr. Tapia had treated her for the previous two years as well. (*See* R. 65.) Moreover, the ALJ improperly assumes the mantle of a medical expert when he concludes that a regime of bi-monthly appointments together with medication is inconsistent with the existence of chronic and debilitating mental illness. According to ALJ Vecchio, Amarante "has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 27). In *Wilson v. Colvin*, 213 F. Supp. 3d 478 (W.D.N.Y. 2016), the court rejected precisely the same conclusion:

> The ALJ further opined that Plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual." This amounts to the ALJ improperly "playing doctor," by relying on his own lay opinion over the multiple, competent medical opinions before him. *See Primes v. Colvin*, 2016 WL

446521, at *4 (W.D.N.Y. Feb. 5, 2016) ("The ALJ repeated this error [of playing doctor] when he opined that Plaintiff 'has not generally received the type of medical treatment one would expect from a totally disabled individual[.]' The ALJ identified no medical expert who opined that Plaintiff's medical treatment was atypical for a person who is disabled. Thus, the ALJ again improperly relied on his own lay opinion.") (internal citation to record omitted; brackets in original); *Andino v. Bowen*, 665 F. Supp. 186, 191 (S.D.N.Y. 1987) ("[T]he Secretary may not 'substitute his or her own inferential judgment for a competent medical opinion, particularly where the ALJ's judgment assumes some degree of medical expertise and would amount to rendering an expert medical opinion which is based on competence he or she does not possess.'") (quotation and citation omitted).

*Id.* at 490-91 (alterations in original); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) ("Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion."); *Garcia v. Barnhart*, 2003 WL 68040, at *6 (S.D.N.Y. Jan. 7, 2003) ("The ALJ must defer questions requiring medical expertise to physicians instead of substituting his own medical conclusions for those already present in the record . . . .").

Most glaringly, ALJ Vecchio incorrectly identifies Dr. Tapia as a primary care physician rather than a psychiatrist (R. 27), thereby denying his opinion the weight accorded to that of a specialist. Other than Dr. Fine's remark at the hearing (R. 44), there is no apparent basis for such a conclusion in the record. To the contrary: in connection with Amarante's earlier SSI application, ALJ Tannenbaum, who had the benefit of a report authored by Dr. Tapia (R. 65), identified him as a treating psychiatrist. (R. 70).[9]

It is therefore necessary to remand Amarante's claim to the Commissioner so that the ALJ may properly consider Dr. Tapia's evidence in light of his role as a treating psychiatrist.

---

[9] This conclusion can be independently verified by searching Dr. Tapia on the internet. *See* http://doctor.webmd.com/doctor/gerardo-tapia-md-9f3b3c80-dd77-4d9f-8804 e82bdb427b95-overview (last visited Sept. 1, 2017).

### D. Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence," a court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in original) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). "Even when a claimant is represented by counsel, it is the well-established rule in [the Second] [C]ircuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Id.* (third alteration in original) (quoting *Lamay v. Commissioner of Social Security*, 562 F.3d 503, 508–09 (2d Cir. 2009)); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

Generally, "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information . . . to fill any clear gaps before rejecting the doctor's opinion." *Ureña-Perez v. Astrue*, 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. June 18, 2009). Where the gaps or inconsistencies concern a treating physician's opinions, and in particular those of a treating psychiatrist, this duty is especially crucial. *See, e.g., Craig v. Commissioner of Social Security*, 218 F. Supp. 3d 249, 268 (S.D.N.Y. 2016) ("The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the

workplace." (quoting *Merriman v. Commissioner of Social Security*, 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 16, 2015)); *Martinez v. Colvin*, 2016 WL 3681426, at *9 (S.D.N.Y. June 15, 2016) (noting that treating physician rule, which generally gives more weight to opinions of treating sources, "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time" (quoting *Lopez-Tiru v. Astrue*, 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011)), *report and recommendation adopted*, 2016 WL 3685092 (S.D.N.Y. July 6, 2016). Thus, "failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." *Concepcion v. Colvin*, 2014 WL 1284900, at *13 (S.D.N.Y. March 31, 2014) (quoting *Miller v. Barnhart*, 2004 WL 2434972, at *8 (S.D.N.Y. Nov. 1, 2004)).

In this case, ALJ Vecchio relied heavily on the function-by-function analyses of Amarante's mental abilities by the two consulting psychiatrists, Dr. Kushner (R. 24) and Dr. Fujiwaki (R.25). He did not address any similar analysis by Dr. Tapia because none appeared in the record. Instead, the ALJ addressed only Dr. Tapia's progress notes. But "[t]he ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced." *Santiago v. Commissioner of Social Security*, 2014 WL 3819304, at *17 (S.D.N.Y. Aug. 4, 2014); *see also Molina v. Barnhart*, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of [ ] that treating physician as to the existence, the nature, and the severity of the claimed disability" (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)); 20 C.F.R. §§ 404.1512(b) (2015), 416.912(b) (2015) (the ALJ shall make "every reasonable effort" to obtain from the individual's treating physician all medical evidence necessary prior to requesting medical evidence from any other source on a consultative basis). "What is valuable about the perspective

of the treating physician – what distinguishes him from the examining physician and from the ALJ

– is his opportunity to develop an informed *opinion* as to the physical status of a patient." *Peed*,

778 F. Supp. at 1246 (emphasis in the original).

We know that Dr. Tapia had such an opinion; it was part of the record in the plaintiff's first

SSI application. According to ALJ Tannenbaum, the record there included:

> A Psychiatric Medical Report with Medical Source Statement Of Ability To Do
> Work-Related Activities (Mental) dated February 22, 2012 from Dr. Gerardo Tapia
> indicating that he has been treating the claimant on a monthly/bi-weekly basis since
> September 8, 2010 for a schizoaffective disorder that causes a marked limitation
> (i.e., a serious limitation with substantial loss of ability to effectively function) in
> her ability to understand and remember simple instructions and an extreme
> limitation (i.e., a major limitation with no useful ability to function) in her abilities
> to carry out simple instructions, to make judgments on simple work-related
> decisions, to understand and remember complex instructions, to make judgments
> on complex work-related decisions, to interact appropriately with the public, to
> interact appropriately with supervisor(s), to interact appropriately with co-workers,
> and to respond appropriately to usual work situations and to changes in a routine
> work setting.

(R. 65.) To be sure, this opinion was issued prior to the period of disability at issue. Nevertheless,

it was plainly relevant and sufficiently close in time to at least raise the question whether

Amarante's condition had materially changed, thus underscoring the need to solicit an updated

evaluation from plaintiff's treating psychiatrist. Indeed, the more recent opinion by Dr. Nuñez,

which the plaintiff submitted with her complaint, suggests that her mental status has not undergone

significant improvement.[10]

---

[10] Standing alone, the Nuñez Letter might not be sufficiently probative to warrant remand, since
it postdated the challenged determination and therefore was outside the period under consideration.
*See Feliciano v. Barnhart*, 2005 WL 1693835, at *10 n.17 (S.D.N.Y. July 21, 2005); *accord
Gonzalez v. Astrue*, 2011 WL 4024707, at *11 (S.D.N.Y. Sept. 12, 2011). Nevertheless, since
remand is otherwise required, the Commissioner should also consider whether this new evidence
sheds light on the plaintiff's condition at the relevant time.

Accordingly, remand is also necessary so that the ALJ may obtain from Dr. Tapia an evaluative report to supplement his progress notes.[11]

## VI.   CONCLUSION

For the reasons set forth above, I conclude that the ALJ erred by failing to fully develop the record and by failing to properly apply the treating physician rule. I therefore recommend, respectfully, that the Commissioner's motion for judgment on the pleadings be DENIED and that this action be remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

<u>**NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS**</u>
<u>**TO THIS REPORT AND RECOMMENDATION**</u>

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Richard J. Sullivan at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Sullivan. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated:  New York, New York
            September  8 , 2017

Respectfully submitted,

**BARBARA MOSES**
**United States Magistrate Judge**

---

[11] Because remand is appropriate, a full substantial evidence analysis is unnecessary.  However, I note that some additional aspects of the ALJ's determination have no support in the record. For example, he concludes that "[t]he claimant has at least a high school education and is able to communicate in English." (R. 27.) Amarante testified that she failed to graduate from high school. (R. 39.)  Further, the record contains numerous references to her inability to speak English. (*E.g.*, R. 39, 298, 333, 572.)